**06-5059-cr**
**USA v. Crawford**

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued May 14, 2008)                                              Decided: July 17, 2008)

Docket No. 06-5059-cr

- - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

Appellee,

- v.-

EUGENE CRAWFORD,

Defendant/Appellant.

- - - - - - - - - - - - - - - - - - - - - - -

Before:  SOTOMAYOR, WESLEY and WALLACE, Circuit Judges.[1]

Appeal from a judgment of conviction entered October 20, 2006 in the United States District Court for the Eastern District of New York (Korman, J.).  We hold that, under the circumstances of this case, the district court abused its discretion when, after jury deliberations began, it reopened the record *sua sponte* and permitted the government to introduce new evidence.  We vacate and remand the case for retrial.

NICOLE BOECKMANN (Susan Corkery, on the brief),
Assistant United States Attorneys, for Roslynn R.

---

[1] The Honorable J. Clifford Wallace, United States Court of Appeals for the Ninth Circuit, sitting by designation.

Mauskopf, United States Attorney, Eastern District of New York, Brooklyn, New York, for Appellee.

JEREMY G. EPSTEIN (Andrew C. Agor and Walter O. Russell, on the brief), Shearman & Sterling, LLP, New York, New York, for Appellant.

J. CLIFFORD WALLACE, Circuit Judge:

Appellant Eugene Crawford challenges his conviction, after a jury trial in the United States District Court for the Eastern District of New York (Korman, J.), of one count of possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).  He argues the district court abused its discretion when it reopened the government's case and admitted additional evidence after the jury had begun deliberations.  We agree, and vacate and remand for retrial.

**BACKGROUND**

On the night of September 18, 2004, Crawford was arrested by a team of officers working for the Targeted Offenders Program of the New York State Division of Parole (TOP). The officers were visiting their assigned parolees' residences to verify compliance with the parolees' mandated curfews.  While the officers were stopped at a traffic light in an unmarked police vehicle, one of them saw Crawford walking on the street and recognized him as a parolee who reported to another TOP officer, Officer Taylor.  The officers stopped Crawford and he explained to them that Taylor knew he was out past his curfew.  One officer contacted Taylor and learned that Crawford did not have permission to be out after hours.

The officers then began to search Crawford, and in his pocket they discovered a tin containing a small amount of marijuana.  The officers placed Crawford under arrest for

possessing marijuana and violating his curfew. At that point, one officer began to search a black gym bag that Crawford had with him. That search was interrupted, however, when Crawford began to flee and the searching officer dropped the bag to chase after him. The bag was picked up by another officer and was later searched when the officers arrived at the police precinct station. The search revealed a .45 caliber semi-automatic pistol and a box containing fifteen rounds of ammunition.

Prior to trial, and pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G), the government notified Crawford's counsel that it intended to call Special Agent Mulham of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to testify at the trial as an expert witness on the movement of firearms in interstate commerce. In a letter dated December 6, 2005, the government wrote, "Special Agent Mulham has determined that the recovered firearm and ammunition related to the above-referenced matter, were manufactured outside the State of New York, and therefore, have moved in interstate commerce. A copy of the trace report for the firearm is attached."

At trial, Mulham provided expert testimony about the manufacturer of the firearm, which was located in Spain, and the importer, which was located in New Jersey. This testimony was corroborated by the firearm itself, which was engraved with the words "made in Spain, RSA Industries, Ocean, NJ." However, the government did not mention or introduce a trace report to demonstrate the chain of legal custody for the weapon. Crawford's attorney cross-examined Mulham and asked,

Q. Do you have any indication as to who [the gun] was sold to?
A. I have never seen the trace on this weapon, so I wouldn't know.
Q. Well, let me ask you something, sir, did you ever do a trace on this weapon?

3

A. No, I did not.

Q. Who did?

A. I don't know. Maybe the case agent on the case, sir. I didn't though.

The government did not call any other witnesses to discuss or lay a foundation for the trace report or to explain its significance.

Crawford testified in the defense case. He stated that he was arrested for violating his curfew, but denied resisting arrest. He testified that at his arrest the officers searched his bag and his person and found nothing. He denied possessing a gun or marijuana. In closing argument, his counsel emphasized that the gun was not found at the scene of the arrest, that no fingerprints were taken to match the gun to Crawford, and that no testimony was presented concerning a trace report. He stated,

> I am going to ask you one other question that may have been lost on an ATF agent. You may ask this question since we all know he told us about registering and everything else, about how being able to trace[] the weapon and everything else, did he ever do any trace that indicated this weapon came by way of a registry into New York State? We all know . . . by just looking at the weapon that it comes from Spain. No, the question was rather pointed. Did you do anything to trace that weapon? The answer was no.

The government did not object and did not address this point in its rebuttal argument.

During the second day of deliberations, the jury sent a note to the district judge asking two questions, one of which was "why wasn't the gun traced to the original owner?" The government told the court that it had a proposed instruction concerning that issue, but the court rejected that suggestion. Upon learning that the government had provided a copy of the trace report to defense counsel before trial, the court stated, "I have the authority to let them reopen the case. You know, we're not playing games here, if the evidence is otherwise admissible. I don't even know how you're hurt."

4

In response to the court's suggestion that it reopen the case, the government offered the testimony of ATF Special Agent Eric Murray, who had conducted the trace report on the gun that was allegedly recovered from Crawford's bag. Prior to that time, the government had not identified Murray as a potential witness. Murray was the case agent and was present during the trial. The court accepted the proffer and ruled that, instead of admitting the trace report, which Crawford's counsel had contended was inadmissible, it would allow Murray to testify that he had conducted the trace and that the report traced the gun back to the last legitimate purchaser, Calvin Smith, who purchased the gun in Maryland.

Crawford's counsel objected to reopening the case, but the court overruled his objection reasoning that, because the trace report did not trace back to Crawford, it was not prejudicial to him. Crawford's counsel insisted it was prejudicial, explaining that "it indicates that there was a trace done . . . . Because there was additional information that indicated that they had done what they were supposed to do and I'm taking the position that they had not done what they were supposed to do." The court rejected this argument, observing that Crawford's counsel had stated earlier that he always assumed that a trace report was going to be put into evidence, so the government's failure to put it into evidence and subsequent reopening of the case to do so could not be prejudicial.

While discussing how to go about reopening the case, Crawford's counsel continued to object, calling it a "devastating situation," but the court responded that, "You've left an erroneous impression with the jury. They picked up on it and I don't know why it can't be corrected. It's one thing to put the government to its burden of proof. It's another to play games here." Over Crawford's objection, Murray was allowed to testify and Crawford's counsel cross-

5

examined him. Before the proceedings began, the government clarified that Murray was only to testify about the question asked in the jury's note.

The jury entered the courtroom and the court instructed:

Ladies and gentlemen, you asked two questions. The first you wanted to have the Taylor testimony about being lenient with Crawford curfew. And the parties agree that Taylor did not give any such testimony. And then the second question is why wasn't the gun traced to the original owner? ATF Agent Mulham was asked whether he had traced the gun to the original owner. He said that he did not. Because you've asked the question, I'm going to reopen the case to allow the government to put in evidence with respect to the issue that you've raised in your note.

The court then permitted Murray to testify about the trace report. He stated that he did a trace on the firearm connected with Crawford's case prior to trial, that the trace tracks the legal change of hands of a firearm, that the trace done on the firearm in question traced it back to an individual named Calvin Smith, that the gun was imported by RSA Enterprises in Ocean, New Jersey and sold to Smith in 1996 by Manchester Shooter Supply, Inc., in Maryland, and that the sale to Smith was the last legal change-of-hands for the firearm.

Crawford's counsel cross-examined Murray, attempting to undermine Murray's personal knowledge of the accuracy of the trace report, pointing out that the last legal owner of the firearm was never contacted regarding the gun, and confirming that Murray was never asked to testify during the trial and was only asked to testify about ten minutes prior to the hearing.

Then, on redirect, the government elicited the following testimony:

Q. Sir, as the case agent assigned, are you familiar with the materials in the government's possession on this case?
A. Yes, I am.
Q. And are you familiar with whether or not the document, the trace report was provided to the defense in this case prior to trial?
A. Yes.

6

Q. And was that document provided to [Crawford's counsel] and Mr. Crawford prior to the commencement of this trial?
A. Yes, it was.
Q. Thank you.

On re-cross, Crawford's counsel confirmed that Mulham had not done the trace report but that Mulham had signed the affidavit for the complaint. The jury was then dismissed to resume its deliberations.

Crawford was found guilty on the count of possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). He was found not guilty of a second count, intentional possession of a defaced firearm, in violation of 18 U.S.C. § 922(k). Crawford filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33, which challenged the district court's decision to reopen the trial to take evidence during jury deliberations. The Rule 33 motion was denied.

**DISCUSSION**

A district court's authority to reopen proceedings after summation, instructions on the law, and after a jury has begun deliberating is a novel question in this Circuit. While we have recognized that a district court has discretion to reopen a criminal case after the close of evidence, we have not issued a published opinion on the propriety of a court's decision to do so after the parties' summations and after the jury has been charged and has begun its deliberations. *See, e.g.*, *United States v. Burger*, 739 F.2d 805, 809-10 (2d Cir. 1984) (holding that a district court has discretion to open a case after the defense rested but before closing arguments commenced); *United States v. Kanovsky*, 618 F.2d 229, 231 (2d Cir. 1980) (same); *United States v. Aiken*, 373 F.2d 294, 300 (2d Cir. 1967) (same). However, the Fourth Circuit addressed this

issue in *United States v. Nunez*, 432 F.3d 573 (4th Cir. 2005). In that case, the Fourth Circuit considered whether a district court abused its discretion when, in response to a jury note, it reopened proceedings after deliberations had begun in order to introduce into evidence a report that had been mentioned by witnesses but never admitted into evidence. *Id.* at 577, 579. After establishing that a district court does have the discretion to reopen a case even after the jury has begun deliberations, the court set forth the following issues to consider when evaluating the district court's exercise of that discretion:

> The court must consider the timeliness of the motion, the character of the testimony, and the effect of granting the motion. The party moving to reopen should provide a reasonable explanation for failure to present the evidence in its case-in-chief. The evidence proffered should be relevant, admissible, technically adequate, and helpful to the jury in ascertaining the guilt or innocence of the accused. The belated receipt of such testimony should not imbue the evidence with distorted importance, prejudice the opposing party's case, *or preclude an adversary from having an adequate opportunity to meet the additional evidence offered.*

*Id.* at 579 (alterations omitted) (quoting *United States v. Peay*, 972 F.2d 71, 73 (4th Cir. 1992)). Addressing these issues, the Fourth Circuit held the district court abused its discretion when it reopened the case after jury deliberations had begun. *Id.* at 580-82.

The Fourth Circuit's approach is consistent with our existing analysis in decisions dealing with a trial court's discretion to reopen a case before summations and jury deliberations. *See, e.g.*, *Burger*, 739 F.2d at 810 (examining whether the defendant was prejudiced by the belated introduction of evidence); *Kanovsky*, 618 F.2d at 231 (examining whether the evidence was relevant, whether the defendant was surprised or prejudiced by the evidence, and whether the defendant had the opportunity to meet the proof as presented); *Aiken*, 373 F.2d at 300 (examining the absence of a reasonable justification for not presenting evidence during the case-in-chief). It

is also consistent with our precedent recognizing that a "judge has wide latitude *not* to interrupt jury deliberations." *United States v. Golomb*, 754 F.2d 86, 89 (2d Cir. 1985) (emphasis added) (examining whether the evidence supported the defendant's version of a dispute in the evidence, whether the evidence concerned a material point, and whether the defense was responsible for the delay). Further, the test comports with the law of other circuits, *see United States v. Walker*, 772 F.2d 1172, 1177 (5th Cir. 1985); *United States v. Larson*, 596 F.2d 759, 778 (8th Cir. 1979), and the Supreme Court's treatment of the issue, *see United States v. Bayer*, 331 U.S. 532, 538 (1947) (applying a similar analysis to uphold a trial court's denial of a defendant's request to reopen a case after the jury had commenced deliberations). Therefore, we will apply the *Nunez* analysis along with our other related precedent to determine whether the district court abused its discretion when it reopened the government's case.

I

The first issue we consider is the timeliness of the evidence and specifically whether there is a reasonable explanation for the government's failure to present the evidence during the case-in-chief. *Nunez*, 432 F.3d at 579; *see also Bayer*, 331 U.S. at 538 (citing the failure to provide excuse for untimeliness as reason for rejecting request to reopen case); *Aiken*, 373 F.2d at 300 (rejecting a request to reopen case based upon failure to provide reasonable justification for not presenting evidence during case-in-chief). Both parties agree that the government has never supplied an explanation for its failure to introduce the trace report into evidence during its case-in-chief. Rather, the government contends that it was not required to offer an explanation because it never moved to reopen the case; instead, the district court exercised its discretion *sua sponte* to reopen the case in response to the jury's question.

9

The government offers no legal support for its argument that no explanation is necessary if a case is reopened by the district court without a motion from a party. In *Nunez*, the government moved to reopen for evidence during jury deliberations "[u]pon prompting by the district court," 432 F.3d at 577, and the Fourth Circuit nevertheless held that the district court had abused its discretion by admitting the evidence absent a "reasonable explanation" from the government for its failure to introduce that evidence at trial. *Id.* at 580. The government does not get a free pass merely because the district judge participates. The government was not ordered to present the evidence without offering its excuse for failing to do so during its case-in-chief. Rather, here, though the district court brought up the possibility of reopening the case and the government never formally moved to reopen, the government took an active role in advocating, shaping, and ultimately exploiting that decision for its benefit. That the district court played an active role in initiating reopening proceedings does not excuse the government from showing that it had a reasonable explanation for failing to introduce the evidence in a timely manner. Indeed, as we have said, "where counsel fails to account adequately for the failure to elicit the evidence . . . there is substantial justification for refusing to reopen the record." *Blissett v. Lefevre*, 924 F.2d 434, 439 (2d Cir. 1991).

Alternatively, the government contends that the district court supplied an explanation for the government's failure to present the evidence when the court opined that the government had simply made a harmless mistake. During the hearing on Crawford's Rule 33 motion, the district court stated,

> The government makes mistakes occasionally and most of the time they pay for it. But I
> don't see that the fact they didn't offer an explanation–it would be one thing if they made

some sort of strategic decision or they were acting in bad faith but, you know, I don't see that the failure to offer an explanation–they overlooked it.

However, this purported finding has no evidentiary basis. Even the government did not assert that its failure was inadvertent. We are not bound to accept the district court's speculation.

The government indicated to defense counsel that the trace report would be introduced by Special Agent Mulham. But he testified he knew nothing about it. He stated the case agent probably knew about it. The case agent, Special Agent Murray, was present during the trial, but was never requested to testify, even though it was he who identified the trace report when called to testify after deliberations had begun.

We observe that the government's actions are susceptible to another interpretation: that the government's failure to introduce the trace evidence during several conspicuous opportunities at trial was a strategic choice. The trace report disclosed that when the last legitimate owner purchased the weapon involved in this case, he also purchased another gun. The government disclosed that this other gun had turned up in the same police precinct where Crawford was arrested, and expressed concern that the evidence of two guns purchased in 1996 in Maryland turning up in the same precinct in 2004 in Brooklyn may give rise to a suspicion that Crawford was framed. It is plausible that the government sought to avoid this inference by omitting the introduction of the trace report and the complication of the second weapon. The government acknowledges that if the failure to offer evidence is the product of a deliberate or strategic decision, it is not the kind of reasonable explanation required to justify reopening the record during jury deliberations.

11

The government's failure to present the evidence is susceptible to at least two interpretations: either it was an oversight or a tactical decision. Neither explanation would justify the dramatic step of reopening its case after deliberations had begun. Thus, this issue weighs in Crawford's favor.

II

The second *Nunez* issue requires an evaluation of the character of the supplemental evidence before reopening the case. *See Nunez*, 432 F.3d at 579. The district court considered and evaluated the nature of the proffered evidence before reopening the trial, including questioning Murray under oath to learn about his testimony. In fact, Crawford does not argue that Murray's testimony about the trace report was not "relevant, admissible, technically adequate, and helpful to the jury in ascertaining the guilt or innocence of the accused." *Id.* The fact that a trace report was done as is standard police procedure was relevant evidence. Unlike the report in *Nunez*, *see id.* at 580-581, Murray's testimony was admissible and technically adequate. Additionally, the evidence of the trace report was probably helpful to the jury.

However, upon reopening, the government did more than just introduce evidence that there was a trace report: it also elicited testimony that Crawford's counsel *knew* that a trace report had been completed, suggesting to the jury that Crawford's counsel had intentionally misled the jury. The fact that Crawford's counsel knew about the trace report was not relevant to answering the jury's question, and the district judge later conceded that the introduction of that testimony had been erroneous. Though the majority of the testimony introduced upon reopening pushes this second *Nunez* issue in the government's favor, the relevance and admissibility of the statements about Crawford's counsel's knowledge are questionable. The government was aware

it was only to ask questions responding to the jury's inquiry note. The government chose to go afield and ask a non-germane question – one that can only be interpreted as an effort to discredit Crawford's attorney. This evidence was not relevant or "helpful to the jury in ascertaining the guilt or innocence of the accused." *Id*. at 579.

                                    III

The final *Nunez* issue considers the overall effect of the evidence and whether its belated introduction "imbue[s] the evidence with distorted importance, prejudice[s] the [defendant's] case, or preclude[s] an adversary from having an adequate opportunity to meet the additional evidence offered." *Id.* at 579.

First, the belated introduction of the trace report probably imbued the evidence with distorted importance. In *Nunez*, the Fourth Circuit attributed substantial weight to this factor and reasoned that it had been triggered solely on the basis that the evidence had been introduced after the commencement of jury deliberations. *See id.* at 581. Other courts have agreed, suggesting that the importance of evidence introduced after the commencement of deliberations is presumptively distorted. *See Bayer*, 331 U.S. at 538 ("[E]vidence, if put in after four hours of deliberation by the jury, would likely be of distorted importance."); *Drummond v. United States*, 350 F.2d 983, 991 (8th Cir. 1965) (holding that motions to reopen after jury deliberations are "presumptively . . . made too late"); *Eason v. United States*, 281 F.2d 818, 822 (9th Cir. 1960) (discussing the "undue emphasis given to the introduced evidence with consequent distortion of the evidence as a whole"). It is difficult to see it otherwise. It is likely that when a court interrupts deliberations to introduce new evidence, a jury may well conclude that the new evidence must be very important. And when, as here, the new evidence is entered after closing

13

arguments, defense counsel cannot minimize any distortion because he cannot comment on the relevance and weight of the new evidence during argument. *See See Nunez*, 432 F.3d at 581.

The government suggests that reopening the case to introduce the evidence did not distort the relative importance of that evidence because the jury asked the court specifically about the trace report and so the court did not, at a late stage in the proceedings, direct the jury's attention to a new piece of evidence. However, on that point the facts are indistinguishable from *Nunez*, in which the jury had sent a note advising the court that it was unable to locate a report that had been mentioned during trial. *Id.* at 577. In response to that note, the district court reopened the trial to permit the admission of the report. *Id.* In that case, as in this one, the jury already had the evidence on its mind, but the Fourth Circuit still concluded that reopening the case for the introduction of the evidence imbued it with distorted importance. It is likely to have done so here as well. When a jury note, which may signify anything from a weighty concern shared by all jurors to a random inquiry by only one, is met with an evidentiary hearing complete with testimony from a previously uncalled government agent, its significance is likely magnified. Furthermore, even if we accepted the government's argument, the testimony elicited went beyond the scope of the jury's question by pointing out that Crawford's counsel knew all along about the report, potentially giving at least this discrediting information a heightened sense of importance.

Second, the belated introduction of the trace report prejudiced Crawford's defense. Defense counsel's summation rested on the existing trial record, in which no trace report had been introduced. It is likely that he would not have made the same argument had the government properly introduced the report during its case-in-chief or if defense counsel had known that the

14

government would have a second chance to introduce the report after his summation. *See Kanovsky*, 618 F.2d at 231 (unfair surprise a relevant factor in determining the propriety of admitting evidence after a party has rested). Though the government argues that Crawford could not have been "unfairly surprised" at the introduction of the trace report because he knew of its existence and the government's plans to introduce it, Crawford's argument is not that the trace report itself prejudiced his defense, but rather that the timing and manner of its introduction did so. After Mulham denied knowledge of the report and the government offered no further evidence of it, the trial record was closed. Crawford's counsel properly relied on the record as it stood for his argument and the later reopening of that record in an unusual procedural move was an unfair surprise.

Most devastating to Crawford, though, was the testimony elicited by the government on redirect showing defense counsel had been given the report prior to trial. That fact had no probative value except to insinuate that defense counsel had attempted to mislead the jury into believing something he knew not to be true. It went beyond the scope of the original purpose of the reopening, which was supposed to have been narrowly-tailored to answering the jury's question, and it was highly prejudicial as it undermined Crawford and his counsel's credibility after the defense had already presented its case. Discrediting Crawford and his counsel in this case was particularly damaging because, as both sides stated in closing arguments, whether the parties were credible was "what this case [was] about." Crawford's entire defense was that the officers testifying were mistaken or lying when they claimed to have found the gun in his bag, because the gun was not found at the scene of the arrest and no other physical evidence

15

connected Crawford to it. The implication that Crawford and Crawford's counsel lied to the jury was very likely to have undermined Crawford's defense.

The government does not contend that the testimony was elicited for any legitimate reason, but instead argues that, by referring to the absence of the trace report evidence in closing argument, Crawford's counsel engaged in improper "gamesmanship." That Crawford's counsel had been "playing games" was also the basis for the district court's decision to reopen the case over Crawford's objection. However, a review of the record shows that defense counsel's statements were not improper. After the government failed to introduce the trace report during Mulham's testimony, as it had disclosed to the defense it planned to do, or through any other testimony, Crawford's counsel could have reasonably concluded that the government had either made a strategic decision to withhold that report, or that it had simply done a poor job in presenting its evidence. In either case, it was appropriate for Crawford's counsel to highlight that omission in his summation. *See United States v. Rubinson*, 543 F.2d 951, 965-66 (2d Cir. 1976) ("Defense counsel certainly is entitled to direct the jury's attention to what he believes are loopholes in the government's case and to argue that these loopholes establish the non-existence of facts which the government would have proven if it had the evidence").

Nor were Crawford's remarks during argument distorting or misleading. He summarized Mulham's testimony and pointed out that, when asked whether he had done anything to trace the weapon, Mulham answered no. That statement was accurate. Any confusion that this caused was the fault of the government, which did not take an opportunity to offer trace report evidence through another witness after Mulham denied knowledge. It was not "playing games" for defense counsel to have commented on the gap in the government's evidence. Even if the jury

16

was left with an erroneous impression, once the government had cleared up any confusion about the trace report during Murray's direct examination, it went too far when it let the jury know that Crawford's counsel had known about the trace report all along.

Even the district court recognized it was troubled by the introduction of the testimony and that its inclusion was erroneous. The court, however, decided that the testimony was harmless, stating that the jury seemed to carefully weigh the evidence and was not influenced by the improper comments. The government does not advocate this position, and we give no weight to the district court's cursory speculation. The *Nunez* test does not require Crawford to show the precise effect that reopening the case had on the jury verdict, and we question whether any such error could be considered harmless. As pointed out earlier, whenever the response to a jury note is a formal evidentiary hearing, the importance of that evidence is unduly amplified to the jury. The attack on Crawford's counsel's credibility was so amplified and was prejudicial.

Third, Crawford was unable to respond adequately to the new evidence. Although Crawford's counsel was permitted to cross-examine Murray, he was not able to comment on it in summation. Nor was he able to determine why the government failed to call Murray during its case-in-chief. The opportunity to argue a point in a way not possible through cross-examining a witness was an important factor to the Supreme Court in *Bayer* and to the Fourth Circuit in *Nunez*. *See Bayer*, 331 U.S. at 538 (stating that the reopening of a case to admit a document four hours after the jury had been deliberating would be prejudicial to the government because it "would then have had no chance to comment on it, summation having been closed"); *Nunez*, 432 F.3d at 581 ("[A]t a minimum," defendants should "have had the ability to address [the newly admitted evidence] and argue its relevance and weight to the jury during summation").

17

Crawford's counsel was unable to argue either about the government's newly introduced evidence or the attack on his credibility. Furthermore, though the district court pointed out that Crawford's counsel never asked to give argument after the reopening and that such a request would have been granted, it is hard to imagine what he could have done to salvage his credibility after the government's unpredictable redirect.

As explained above, this final factor of prejudice weighs heavily in Crawford's favor. When, over his repeated objection, the evidence was reopened after the jury had begun deliberations, the significance of the trace report was distorted and his counsel's credibility was intentionally attacked. Moreover, he lacked an adequate opportunity to respond to the prejudicial testimony.

**CONCLUSION**

While we need not adopt a blanket rule against admitting evidence after the start of jury deliberations to resolve this case, we observe that it must be done with "extreme reluctance," *Eason*, 281 F.3d at 822, given the substantial risk of prejudice to the defendant. Here, balancing the *Nunez* issues, we conclude that the district court abused its discretion when it reopened the case for additional testimony after the jury began deliberations. The government provided no reasonable explanation for its failure to introduce the evidence during its case-in-chief, and the evidence that Crawford's counsel knew about the trace report prior to trial was not relevant and was highly prejudicial. We therefore vacate Crawford's conviction and sentence and remand for a new trial.

VACATED AND REMANDED.